

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

AUG 2 6 2005

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| JAMEY L. SILVA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 5:05-CV-041-C |
| | § | |
| JO ANNE B. BARNHART, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Plaintiff Jamey L. Silva seeks judicial review of a decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB). The United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this case to the United States Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law, and a proposed judgment. After reviewing the administrative record and the arguments of both parties, this court recommends that the District Court affirm the Commissioner's decision.

## I.    Facts

Silva applied for DIB on September 18, 2001, claiming that he was disabled and unable to work because of a degenerated disc at the L5-S1 level. (Tr. 97, 172.) At that time he was twenty-seven years old and had previously worked as a restaurant assistant manager and an order puller and loader. (Tr. 23, 173.)

Silva's physical problems began in August 2000 during his work as an order puller and loader.  At that time he complained of headaches and neck and shoulder pains that were believed to be caused by the work he did at his job.  (Tr. 202, 518.)  Nancy B. Gonzalez, M.D., assessed cervical and shoulder strain, released Silva to work with restrictions, and treated the condition with medication and physical therapy which improved Silva's symptoms.  (Tr. 199-202)

Thereafter, Silva began complaining of pain in his lower back that began one day after pushing, pulling, and lifting heavy objects at work.  (Tr. 199.)  Dr. Gonzalez assessed lumbar strain and treated the condition with medication and physical therapy.  (Tr. 198-99.)  By early September 2000, Silva's neck and shoulder pains had completely resolved but the pain in his lower back persisted despite treatment.  (Tr. 198.)  Dr. Gonzalez suspected symptom magnification and recommended an MRI in order to determine whether there was an objective basis for Silva's complaints.  (Tr. 197-98.)  The MRI showed disc desiccation, decreased disc height, a mild central posterior disc bulge at the L5-S1 level that abutted but did not displace the nerve roots, and evidence of an annular tear to the bulging disc.  (Tr. 196, 205.)

Dr. Gonzalez recommended that Silva remain on light duty status at work and continued to treat him with medications and physical therapy.  (Tr. 192-95, 216-21.)  She also referred him to Selma Wilson, M.D., who provided him with an epidural steroid injection on November 29, 2000.  (Tr. 192.)  Silva claimed that the injection did not relieve his pain.  (*Id.*)

2

In December 2000, Dr. Gonzalez again recommended that Silva continue working. (Tr. 215.) She also recommended that he work at the sedentary level and that he wear a back brace at work. (Tr. 215.) Dr. Gonzalez' recommendation was corroborated by a functional capacity evaluation completed by an occupational therapist. (Tr. 229-33.)

Silva stopped working in March 2001 but continued to receive treatment under his employer's insurance coverage. (Tr. 172, 519.) He reported that his employer would not allow him to return to work until his health was fully restored. (Tr. 519.) The evidence shows that before and after he quit working, Silva's condition was treated with pain management techniques, including narcotics, physical therapy, and other conservative procedures, which sometimes provided pain relief. (Tr. 265, 273, 286-87, 308, 350, 354, 366, 378.)

On June 27, 2002, neurosurgeon Lloyd M. Garland, M.D., evaluated Silva's condition at the request of his employer's insurance carrier. (Tr. 518-21.) Dr. Garland reported that an MRI from March 2002 showed "degenerative changes of the disc at the L5-S1 level with a little residual eccentric protrusion of the disc slightly more to the left," which did not present a change from the findings of the MRI in September 2000. (Tr. 519-20.) He also reported that Silva was in no acute distress, that there was no sign of atrophy, weakness, or fasciculations, that Silva's reflexes were brisk, and that he walked with a normal gait. (Tr. 520.) He concluded that there was not anything further to offer Silva from a surgical standpoint and that Silva's condition would not significantly improve with an operative procedure with the "minimal findings" that were then present. (Tr. 521.)

3

However, Mark D. D'Alise, M.D., examined Silva in September 2002 and recommended a "simple single level lumbosacral reconstruction" with a posterior lumbar interbody fusion. (Tr. 563.)  Dr. D'Alise's expectation was that the procedure would improve rather than eliminate Silva's discomfort but also expected that Silva would be capable of sedentary work activity after recovering from the procedure.  (*Id.*)  Silva underwent the procedure on November 1, 2002, which was successful with good alignment and positioning.  (Tr. 564, 567, 575-76.)  Silva experienced some relief from pain but his pain returned.  (Tr. 559, 562, 573.)  Dr. D'Alise noted on July 1, 2003, that there were no objective findings on multiple radiographic workups and that he would rely on a pain management physician to treat Silva's symptoms  (Tr. 558.)  Thereafter, Silva's pain was treated with prescription medications.  (*See, e.g.,* Tr. 546, 552.)

The Administrative Law Judge (ALJ) held a hearing and issued a decision on April 16, 2003, finding that Silva was not disabled because he could perform light work activity with limitations despite his severe impairments and could perform work in the national economy.  (Tr. 94-105.)  Silva appealed to the Appeals Council and the Appeals Council remanded the ALJ's decision for further evaluation of a number of issues. (Tr. 109-11.)

On remand, the ALJ found that Silva's severe impairments restricted him to performing sedentary work with limitations, that he could perform jobs in the national economy identified by the vocational expert, and that he was not disabled.  (Tr. 24-25.)

4

II.    **Issues Presented**

Silva contests the Commissioner's denial of his application on a number of inter-related grounds.  He contends that the ALJ failed to comply with the remand order entered by the Appeals Council.  He also contends that the ALJ erred (1) in finding that he did not satisfy the disability requirements under the Commissioner's regulations; (2) in disregarding relevant medical evidence and failing to consider the totality of the medical evidence; and (3) in finding that he could perform the requirements of sedentary work activity.[1]

The first issue, whether the ALJ complied with the Appeals Council's remand order, relates to whether the ALJ (1) obtained updated records from Silva's treating physician; (2) obtained additional evidence including, if necessary, a consultative examination concerning Silva's back impairment; (3) further evaluated Silva's subjective complaints of pain; (4) further evaluated Silva's residual functional capacity; and (5) obtained evidence from a vocational expert to clarify the effect of Silva's limitations on his occupational base.

III.    **Discussion**

The ALJ complied with the Appeals Council's remand order.  He obtained and discussed updated medical records from Silva's treating physicians as well as a consultative neurological examination by H.S. Chuang, M.D.  (Tr. 20-21.)  He considered Silva's subjective allegations under the standards set forth under 20 C.F.R. § 404.1529 and credited

---

[1]

Silva contends in his supporting brief that the ALJ erred in finding that he could perform the requirements of light work activity.  However, the ALJ found that Silva could perform restricted sedentary rather than light work activity.  (Tr. 21, 25; *see also* Tr. 82.)

Silva's allegations to an extent but ultimately determined that his pain did not preclude all work activity. (Tr. 21-22.)

The ALJ also gave further consideration to Silva's residual functional capacity under the standards set forth under 20 C.F.R. § 404.1545 and changed his conclusion in this respect finding that Silva retained the ability to perform restricted sedentary work rather than restricted light work as he had found in his first decision. (Tr. 22; *compare* Tr. 102.) Specifically, he determined that Silva could perform sedentary work that would allow frequent opportunities to alternate sitting and standing and that would involve work at the lower end of detailed instruction. (Tr. 25.) Finally, the ALJ obtained supplemental evidence from a vocational expert to clarify the effect Silva's limitations would have upon the occupational base. (Tr. 24, 82.) Thus, the ALJ complied in all respects with the Appeals Council's remand order and Silva's contentions to the contrary must be rejected. (*See* Tr. 20-24, 110.)

Silva's contention that the ALJ erred in finding that he did not satisfy the disability requirements of the Commissioner's regulations must also be rejected. Silva argues that he suffers from discogenic and degenerative lumbar spine disorders, severe pain, and mental disorders, that the ALJ was required to consider these impairments in combination, and that his impairments meet a listed impairment in the Commissioner's regulations. He contends that the combination of his impairments presents a marked restriction of daily activities, marked difficulties maintaining social functioning, frequent deficiencies of concentration,

persistence or pace, or repeated episodes of decompensation in work or work-like settings. He further contends that his inability to work and complete daily responsibilities require a finding that he is disabled under a listed impairment.

Silva does not identify which listed impairment he believes should be applied in his case. However, a claimant may meet the listing for affective disorders if he exhibits the mental limitations Silva contends he suffers. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04 (2004).

In order to meet the listing, Silva must show that he meets each of the criteria included in Listing 12.04. *See Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990); *see also* 20 C.F.R. §§ 404.1525(c), 404.1526(b).

Silva has not shown that he meets each of the criteria of Listing 12.04 and the evidence does not support such a finding. A claimant can show that he meets the criteria of Listing 12.04 by showing under the "A" and "B" criteria of the listing that he has either a depressive syndrome, manic syndrome, or bipolar syndrome which results in at least two of the following: a marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation of extended duration. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04. In the alternative, he may demonstrate under the "C" criteria that he meets the listing by showing a medically documented history of a chronic affective disorder that has caused more than a minimal limitation of ability to do basic work activities

7

and either (1) repeated episodes of decompensation; (2) evidence that a residual disease process is such that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate; or (3) a history of one or more years of an inability to function outside a highly supportive living arrangement and an indication of a continued need of such an arrangement. *Id.*

The evidence shows that Silva was diagnosed with depressive disorder; however, there is no evidence that his depressive disorder resulted in the limitations or restrictions included in Listing 12.04. (Tr. 295-305, 494-507.) Although Silva's back problems and resulting pain may result in a degree of the limitations he alleges, Listing 12.04 requires evidence that the claimant's psychological disorder rather than any physical disorder result in the restrictions included in the listing. *Id.* The evidence does not show that Silva's depressive disorder resulted in the limitations required under the "A" and "B" criteria. Further, there is no medical documentation that Silva's limitations were of the severity as those listed under the "C" criteria. (*Id.*)

A State agency physician found that Silva had only mild restrictions in activities of daily living and only mild difficulties in maintaining social functioning and maintaining concentration, persistence, and pace. (Tr. 504.) He also found that Silva had not experienced any episodes of decompensation. (*Id.*) Psychologist William E. Hoke, Ph.D., examined Silva and reported that Silva described himself as warm, outgoing, and interested in other people. (Tr. 302.) Dr. Hoke found that Silva had good concentration skills, was likely to

seek out opportunities for social involvements, and was generally able to meet day-to-day responsibilities. (Tr. 300, 302.)

The psychological findings in the record do not indicate that Silva experienced the extreme limitations described in the criteria of Listing 12.04. Therefore, his contention that the ALJ erred in not finding that he met the criteria of a listed impairment must be rejected.

In regard to the ALJ's evaluation of the medical evidence, the ALJ did not disregard medical evidence or fail to consider the totality of the medical evidence. Silva did not specifically identify which evidence he contends the ALJ failed to consider. Nonetheless, the ALJ's decision demonstrates that he considered all the medical evidence, including evidence favorable to Silva's claim as well as evidence unfavorable to his claim. (Tr. 16-22.) Further, the evidence as a whole and the evidence the ALJ considered pursuant to the remand order from the Appeals Council substantially supports his ultimate conclusion that Silva is not disabled, as that term is defined in the Commissioner's regulations.

The ALJ provided a thorough summary and analysis of the course and type of treatment prescribed to Silva as well as the opinions of treating, examining, and consulting physicians. He considered examination notes from these physicians, examination and progress notes from Silva's physical therapists, findings from MRI and other radiographic testing, and the range of treatment prescribed for Silva's impairments. (*Id.*)

After considering the evidence in the record, the ALJ found that the level of pain Silva reported was not consistent with the objective medical evidence and concluded that he

9

retained the residual functional capacity to perform restricted sedentary work. (Tr. 22.)
He based his conclusions on the evaluations provided by State agency physicians; evidence
provided by Silva's neurosurgeon, Dr. D'Alise; and on findings from neurologist
H.S. Chuang, M.D. (Tr. 22-23.)

Dr. D'Alise expected that the posterior lumbar interbody fusion Silva underwent in
November 2002 would improve his condition to the extent that he could perform sedentary
work. (Tr. 563.) Objective evidence showed that the procedure was successful with good
alignment and positioning. (Tr. 564, 567, 575-76.) Although Silva continued to complain
of pain after the surgery, Dr. D'Alise ultimately discharged him from his care on July 1,
2003, noting that there were no objective findings on multiple radiographic workups.
(Tr. 558.)

Dr. Chuang examined Silva on March 23, 2004. (Tr. 535-42.) Among his findings
was that Silva had normal reflexes and that there was a lack of muscle wasting or weakness
in any of his four limbs. (Tr. 537.) Dr. Chuang concluded that Silva's neurological
examination was "essentially normal." (*Id.*) He believed that Silva was capable of
occasionally lifting and/or carrying up to 20 pounds; frequently lifting and/or carrying
10 pounds; standing and/or walking one to two hours in an eight-hour workday; and sitting
for less than about six hours in an eight-hour workday. (Tr. 538-59.)

The foregoing evidence provides substantial support for the ALJ's conclusion that
Silva could perform the requirements of restricted sedentary work. In reviewing a Social

Security appeal, it is not the court's duty to make a *de novo* determination or substitute its judgment for that of the Commissioner; rather, a court must determine whether the Commissioner's decision is supported by substantial evidence and that it was reached through proper legal standards. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence that a reasonable mind might accept as adequate to support the Commissioner's decision. *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002) (citation omitted). A finding of no substantial evidence is appropriate only if no credible evidentiary choices exist to support the decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

In this case, the evidence as a whole supports the ALJ's decision and the opinions provided by Dr. Chuang and Dr. D'Alise provide specific evidentiary support for the Commissioner's decision. Therefore, the decision is conclusive and must be affirmed. *Watson*, 288 F.3d at 215.

## IV.   Right to Object

Pursuant to 28 U.S.C. § 636(b)(1), any party has the right to serve and file written objections to the Report and Recommendation within 10 days after being served with a copy of this document. The filing of objections is necessary to obtain de novo review by the United States District Court. A party's failure to file written objections within 10 days shall bar such a party, except upon grounds of plain error, from attacking on appeal the factual

findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

Dated: _____, 2005.

NANCY M. KOENIG
United States Magistrate Judge

12